**IMPERIAL FURNITURE COMPANY,**
Inc., Appellee,

v.

**PIEDMONT AVIATION, INC., and**
Federal Insurance Company,
Appellants.

**IMPERIAL FURNITURE COMPANY,**
Inc., Appellant,

v.

**PIEDMONT AVIATION, INC., and**
Federal Insurance Company,
Appellees.

Nos. 9888, 9889.

United States Court of Appeals
Fourth Circuit.

Argued June 2, 1965.

Decided July 12, 1965.

Thomas M. Starnes, Morganton, N. C. (Patton, Ervin & Starnes, Morganton, N. C., on brief), for appellants in No. 9888 and appellees in No. 9889.

Harry DuMont, Asheville, N. C. (Uzzell & DuMont, Asheville, N. C., on brief), for appellee in No. 9888 and appellant in No. 9889.

Before HAYNSWORTH, Chief Judge, SOBELOFF, Circuit Judge, and HUTCHESON, District Judge.

HAYNSWORTH, Chief Judge:

This controversy presents cross-claims for property damage arising out of a midair collision between two airplanes approaching the Hickory, North Carolina, airport for a landing. The District Judge found fault on the part of the commercial airliner in making a right turn in the vicinity of the airport, but concluded that that fault was not shown to have been a proximate cause of the collision. He concluded that, as the finder of fact, he was unpersuaded that the evidence showed fault on the part of the executive aircraft owned by the Imperial Furniture Company, Inc. As a result, the cross-claim of each party was dismissed and each party has appealed.

We conclude that absolution of the commercial airliner is supportable, but that a finding of fault on the part of the other aircraft was compelled.

On April 29, 1960 at approximately 12:39 P. M., a twin-engined turboprop airliner, designated as an F–27, departed Tri-Cities Airport, Tennessee, as Piedmont Aviation's Flight 50. Its next scheduled landing was at Hickory, North Carolina. Leaving Tri-Cities, the F–27 was placed on a heading of 120° to 130° until it intercepted the Hickory radio beacon. It then homed on the Hickory VOR radio beacon, which is approximately 10.2 miles northeast of the Hickory airport. When in the vicinity of the beacon, it made a right turn to 225 degrees, which heading brought it to the vicinity of the airport. Approximately two miles from the airport, it turned right to approximately due west, which course it followed for approximately two miles until it made a roughly 90° turn to the left, which brought it in alignment with the North-South runway upon which it intended to land. The plane was in a gradual descent from the time it passed the crest of the mountains until near the end of its final approach.

Meanwhile, a twin-engined Cessna 310, an executive aircraft, small relative to the F–27, was also approaching the Hickory airport for the purpose of landing on runway 19.[1] There was a dispute in the evidence as to whether or not the Cessna's approach was straight in or whether it had come out of a sharp and steeply descending turn to the left immediately prior to the impact. There is no dispute that when the two planes were about 800 feet from the runway, the Cessna landed with force on the left wing of the F–27 leaving the imprint of its tires astride the port engine, as the propeller of the F–27 tore into the Cessna's nose section, dislodging the nose wheel. The nose of the Cessna bounced up after the impact, placing the Cessna in a stalling position. The vertical fin of the F–27 then struck the right rudder of the Cessna and a moment later sheared off the right wing tip of the Cessna. The Cessna then went into a spin and plummeted to the ground. It was demolished, of course, and its pilot and passengers were killed.

Notwithstanding the collision and the damage it sustained, F–27 was safely landed without injury to any of its passengers or its crew.

This action was brought initially for recovery of some $72,000, representing

1. The North-South runway at Hickory is numbered 19, because, for aircraft landing or taking off in a southerly direction, its bearing is approximately 190°, the first two digits of the bearing supplying the number of the runway.

the value of the Cessna less the scrap. Piedmont cross-claimed for the cost of repairing its F–27 amounting to some $37,000, plus other damages which it claimed on account of loss of its use while undergoing repairs.

The Hickory airport is a small, uncontrolled airport. That is, there is no control tower advising and regulating the movements of arriving and departing airplanes. The Federal Aviation Agency does maintain there an information service. It has radio equipment through which it can communicate with aircraft in the area and it is utilized as a clearing house for information as to traffic in the vicinity. A private company, Cannon Aviation, also had radio equipment, known as Unicom, on the field through which it could communicate with aircraft in the area, and it was used by aircraft to relay personal messages. Finally, Piedmont Air Lines had its own radio equipment through which its ground personnel could communicate with its airplanes in the area.

Piedmont's F–27 had called in to Piedmont radio at Hickory at 12:54 P. M. reporting its presence in the area. In return it received information about the wind direction and the weather which, incidentally, was excellent and with unlimited visibility. At 1:00 P. M. there was another communication between Piedmont's ground personnel at Hickory and the F–27 during which the F–27 was advised of a slight change in the wind and the fact that a single-engine Cessna, not, of course, the one subsequently involved in the collision, was taking off from runway 24. At 1:03 or 1:04 P. M., Piedmont's ground personnel learned from Federal Aviation Agency Flight Service that the Cessna 130 had reported its presence in the area at 1:02 P. M. Earlier, at 12:45, the Cessna had called Cannon Aviation on the Unicom, requesting that Cannon order a taxicab for the use of the Cessna's passengers. Cannon, of course, did not report this call to flight service, and Cannon had no duty to do so.

At approximately 1:06 P. M. the F–27 was informed by Piedmont's ground personnel that the Cessna was close above and behind it and to "go around." Obedient to this suggestion, the F–27's captain ordered landing gear and flaps up and began to apply power intending to scrub the landing and circle the field for another landing approach. Before the added power took effect, however, or the descent of the F–27 had been affected, the collision occurred. The captain immediately took off the added power, ordered the gear and flaps down again and successfully landed the plane on runway 19.

After 1:03 or 1:04 P. M., a Flight Service specialist tried to contact the Cessna to inform it of the presence of the F–27. It could get no response from the Cessna.

■ The District Court found, in agreement with the testimony of all the eyewitnesses, that immediately prior to the impact the Cessna was above, behind and to the left of the F–27. Each circumstance—the fact that the Cessna was overtaking the F–27, was at a higher altitude, and was to the left of the F–27—gave the right of way to the F–27 under Civil Air Regulations, Part 60, and obliged the Cessna to give way. The District Judge was of the opinion, however, that the evidence did not disclose how long the Cessna had been above behind and to the left of the F–27. It is true that several witnesses saw the two aircraft only an instant before their impact and their testimony discloses nothing of the relative positions of the planes earlier than the first observation of those witnesses. However, there was testimony by other witnesses who observed the planes earlier when they were separated by a substantial distance. This testimony would readily warrant a finding that the Cessna was descending from a much higher altitude and at a much sharper angle, and was in an overtaking situation an appreciable length of time. This evidence is strongly supported by the fact of the Cessna's hard landing on

the F–27's wing, without any previous contact between the Cessna and the F–27's high, vertical fin or its propeller. It is still further buttressed by the subordinate fact, as found by the District Court, that the Cessna came out of a steeply banked descending turn immediately before the impact as the F–27 was close to completion of its final approach to the runway.

No one ever saw the Cessna below or in front of the F–27. If it ever was, at any relevant time, it is inconceivable that the collision would have occurred. In the process of change from such a relative position to that which existed immediately prior to impact each aircraft certainly would have been sighted by the other. The logical explanation is that the Cessna did not see the F–27 because the F–27 was beneath it at all relevant times. The F–27 did not see the Cessna because the Cessna was above and behind it. All the witnesses who saw the two planes confirmed the fact, though some observed the two later than others, that for a few moments before the impact the Cessna was above and behind the F–27 and that it overtook and landed hard upon the wing of the F–27. This requires the conclusion, we think, that the Cessna was the burdened aircraft, bound to have observed and to have given way to F–27.

The District Judge speculated, however, that Cessna might have seen F–27 as it made its right turn into a westerly heading out of which it later turned left again for its final approach to the runway. He reasoned that F–27's right turn was in violation of Civil Air Regulation 60.18 which requires "when approaching for landing, all turns shall be made to the left * * *," unless markings requiring right turn patterns are displayed at the airport. While he concluded that this right turn, which he found to be in violation of the regulation, was not a proximate cause of the accident so as to support a finding of liability on the part of F–27, he reasoned that it could have misled Cessna into believing that F–27

was departing from the area. Thus was Cessna's inattentiveness excused.

■ We find nothing to warrant this speculation. It is true that the rule requires that all turns shall be to the left when approaching for a landing, and the standard left turn procedure was in effect at Hickory. The usual and proved method of entering the landing traffic pattern, however, is by a turn to the right. The standard practice is not to fly over the airport and across the traffic pattern in order to enter it from the inside by a left turn. It is only after a plane has entered into a traffic pattern, usually and preferably by a right turn, that left turns are required.

When F–27 made its right turn, it was northeast of the airport and approximately two miles away. Its right turn was to a westerly heading which was patently a base leg in the traffic pattern for aircraft intending to land on runway 19. In a relatively shallow descent all the while, it should have been apparent to any knowledgeable observer that F–27 was on the base leg of its landing approach and would turn left when it had advanced sufficiently on its base leg to be aligned with the runway as it completed its left turn. Any plane departing the Hickory airport could not have made a right turn from a southwesterly heading to west at a point northeast of the airport. Whatever runway was involved, a departing aircraft would not have executed the F–27's maneuver at that place. In short, if Cessna saw F–27's right turn onto the base leg of the landing approach pattern, it had every reason to believe that F–27 was in the landing pattern and that Cessna should stay clear.

■ Finding no possible excuse for Cessna and there being no valid basis for the District Court's speculation, we conclude that the finding of fault by Cessna was compelled by the evidence.

■ Cessna's primary effort to fasten the blame upon F–27 was through a witness who testified that F–27 made a

"straight in approach." He testified that F-27 approached the area on a course somewhat east of south and made a slight right turn to line itself up with runway 19, and thus entered its final approach. There was abundant testimony, however, to support the District Court's finding that F-27 did enter the traffic pattern on the base leg, turning from that leg upon its completion into its final approach.[2] In any event, however, the District Court properly found that Piedmont Airlines had a right to make a straight in approach under the applicable Civil Air Regulations and with the permission of the airport manager. This included the right to enter the traffic pattern by a right turn on the base leg, notwithstanding the fact that local traffic under usual visual flight rule conditions was required by local regulations to enter the traffic pattern on a downwind leg, that is, on a course reciprocal to that of the active runway, with a subsequent left turn onto the base leg and a second left turn onto the final approach.

██ Nor do we find any merit in Cessna's contention that because F-27 had radio equipment by which it could have communicated with Flight Service or with Cannon Aviation, it should have monitored both frequencies and thus have intercepted Cessna's communication with Cannon at 12:45, when it requested the taxicab, and with Flight Service at 1:02. F-27 could have monitored either of those frequencies, but its practice was to monitor only Piedmont radio's frequency so that its crew might hear distinctly, without interference from other extraneous radio communications, all communications directed to it from Piedmont radio. As F-27's captain clearly explained, guarding other frequencies would be a hindrance and detriment rather than a reasonable precaution.

We are concerned by the fact that F-27 was not informed of Cessna's presence in the area until approximately 1:06. Flight Service had heard from Cessna at 1:02 and, if it then knew of F-27's presence in the area, it would be supposed that Flight Service would then have informed Cessna of the fact.[3] There was direct, special telephone service between Piedmont and Flight Service so that either might readily buzz the other. Flight Service was told of the presence of F-27 in the area at 1:03 or 1:04. At that same time, Piedmont was told of the presence in the area of Cessna.[4] Piedmont radio did not inform F-27 of Cessna's presence in the area until 1:06, however, a circumstance which would seem inexplicable were it not for the fact that the only testimony as to the substance of the communication of Flight Service at 1:03 or 1:04 was that Cessna was in the area but should by then have landed. The recipient of that message, Piedmont's employee, stepped out of the building to look for Cessna. Having been told that Cessna by then had landed or should have landed, the information he had obtained at 1:03 or 1:04 seems upon its face irrelevant as far as F-27's landing was concerned, provided only that Cessna had cleared runway 19 or had ample time remaining within which to do so. Under these circumstances, the fact that Piedmont's employee chose to leave the building to look for Cessna to determine for himself where it was, rather than immediately relaying the information to F-27, does not require a finding of fault on the part of Piedmont. Pied-

---

2. There is also testimony that Cessna made a straight in approach.

3. At that small airport with very few commercial flights one would suppose that Flight Service knew that Flight 50 was due in the area.

4. The times are stated in accordance with the findings below. Reading the testimony of Piedmont's employees leaves one with the impression Piedmont's inquiry of Flight Service was earlier. However, Flight Service's log discloses that it first learned of Cessna's presence in the area at 1:02. This strongly supports the District Court's finding that the communication between Flight Service and Piedmont during which Piedmont was told of Cessna was subsequent to 1:02.

mont's employee remained outside until he did observe Cessna, but then the two aircraft were close to collision and, as we have observed earlier, F–27 was informed of Cessna's presence too late for it to take effective evasive action.

While the fact that Cessna's presence was not reported to F–27 in time to permit F–27 to have avoided the collision, and the fact that the report of F–27's presence was never heard by Cessna, were unquestionably contributing causes to the collision, we cannot say that the District Court's exculpation of Piedmont in light of the only testimony as to the substance of the communication from Flight Service at 1:02 P. M. does not have a basis in the evidence. The record indeed is skimpy here, and the emphasis throughout was upon matters which in the aftermath of the trial seem largely extraneous. There was great probing into the flight patterns, what they are, when they should be flown and how, and much emphasis upon the possibilities of direct communication between F–27 and Cannon Aviation or Flight Service, but relatively little attention to the actual communications between Piedmont's ground personnel at Hickory and Flight Service, or their established procedures when a regularly scheduled airliner is approaching the airport on schedule or slightly late.

Without further development of the subject, we may speculate that some other trier of fact might find fault with Piedmont's communications and possibly predicate liability upon it. This record, however, does not require such a finding and readily permits the District Court's ultimate finding of no fault on Piedmont's part in that respect.

The judgment below is reversed insofar as it dismissed Piedmont's counterclaim. It is affirmed insofar as it dismissed Imperial's complaint. The case is remanded for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, and remanded.